UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JOANN CORSO,

                                          Plaintiff,

                    - against -                                          **OPINION AND ORDER**

                                                                          No. 11-CV-8602 (CS)
BRIAN FISCHER, in his official capacity as Commissioner,
Department of Corrections and Community Supervision,

                                          Defendant.
------------------------------------------------------------------------x

<u>Appearances:</u>
Michael H. Sussman
Sussman & Watkins
Goshen, New York
*Counsel for Plaintiff*

Steven N. Schulman
Office of the Attorney General, State of New York
New York, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        Before the Court are Plaintiff's Motion for Summary Judgment, (Doc. 35), and

Defendant's Cross-Motion for Summary Judgment, (Doc. 40).  For the reasons set forth below,

Plaintiff's Motion is GRANTED and Defendant's Cross-Motion is DENIED.

## I.  <u>BACKGROUND</u>

### A.  <u>Factual Background</u>

        The following facts are based on the parties' Local Civil Rule 56.1 statements, supporting

materials, and other evidence in the record from previous stages of litigation,[1] and are undisputed

except where noted.

---

[1] *See* Fed. R. Civ. P. 56(c)(3) ("Materials Not Cited.  The court need consider only the cited materials, but it may
consider other materials in the record.").

Since 1998, Plaintiff Joann Corso has worked as a Corrections Officer for the New York State Department of Corrections and Community Supervision ("DOCCS").[2]  (P's 56.1 ¶ 2; D's 56.1 ¶ 8.)[3]  DOCCS is a New York State agency responsible for administering the State's corrections and parole systems, including approximately 94,000 inmates and parolees.  (D's 56.1 ¶ 3.)  DOCCS operates sixty correctional facilities and thirty-nine parole field offices and employs approximately 29,000 individuals.  (*Id.* ¶ 4.)  Defendant Brian Fischer is the Commissioner of DOCCS.  (P's 56.1 ¶ 5.)

For many years, DOCCS has maintained policies governing the personal association of employees with current and former inmates and their associates.  (D's 56.1 ¶ 9.)  This "Work Rule," which appears in the New York Compilation of Codes, Rules, and Regulations at Title 7 Section 52.18 and in Section 2.15 of the DOCCS employee manual, remained substantially unchanged from 1998 until 2012.  (*Id.* ¶¶ 9-11.)  At the time this case was initiated, Section 2.15 of the employee manual read as follows:

> **Association with inmates or persons engaged in unlawful activities.**
> Except as otherwise authorized by [the appropriate DOCCS official], no employee shall knowingly:
>
> (a)  Associate or have any dealings with criminals or persons engaged in unlawful activities; or
>
> (b)  Engage in any conversation, communication, dealing, transaction, association, or relationship with any inmate, former inmate, parolee or former parolee, or any visitor, friend, or relative of same in any manner or form which is not necessary or proper for the discharge of the employee's duties.

---

[2] DOCCS was created from the April 1, 2011 merger of the New York State Department of Correctional Services ("DOCS") and the New York State Division of Parole.  (Declaration of Daniel F. Martuscello III ("Martuscello Decl."), (Doc. 42), ¶ 4.)  For simplicity, I will consistently refer to the State's corrections department as "DOCCS" regardless of its formal name at the time.

[3] "P's 56.1" refers to Plaintiff's Rule 56.1 Statement of Undisputed Facts.  (Doc. 37.)  "D's 56.1" refers to Defendants' Response to Plaintiff's Local Civil Rule 56.1 Statement and Statement of Additional Undisputed Material Facts.  (Doc. 43.)

> Any contact or attempt to contact an employee by an inmate as described above shall be reported to [the appropriate DOCCS official.]
>
> All requests for inmate association shall be addressed to the Office of the Inspector General for review.  The Inspector General will forward his decision to [the appropriate officials, who will then] notify the requesting employee of the final determination.

(Schulman Aff. Ex. A.)[4]  The Work Rule does not identify any standards or guidelines for when exceptions will be granted.  (*See id.*)  Noncompliance with the Work Rule may subject the employee to discipline, including possible discharge.  (*See* Corso Aff. ¶ 13; First Fonda Decl. ¶ 2.)[5]

Since beginning her employment as a Corrections Officer, Plaintiff has submitted numerous requests to associate with inmates or former inmates.  In October 1998, Plaintiff requested and received permission to associate with her then-husband Michael Bruno, who was on parole at the time, for the purpose of securing a divorce.  (First Fonda Decl. Ex. A.)  In January 2003, Plaintiff requested and received approval to correspond with and visit her son, who had been incarcerated in the Orange County Jail.  (First Fonda Decl. Ex. E.)  In March 2010, Plaintiff requested permission to "write or talk for support" with Bruno, then an inmate at Walkill Correctional Facility, upon learning that Bruno had been diagnosed with cancer.  (Schulman Aff. Ex. B, at 3.)  This request was granted for correspondence only.  (*Id.*)  In August 2010, Plaintiff submitted a request to associate with Bruno in person upon his release (which she expected to occur later that month), because their children were close and Plaintiff wanted to be able to interact with Bruno at family gatherings.  (First Fonda Decl. Ex. C.)  This request was approved for correspondence, but because Bruno's release date had been postponed in the

---

[4] "Schulman Aff." refers to Counsel's Declaration of Steven M. Schulman.  (Doc. 13.)

[5] "Corso Aff." refers to Affidavit of Joann Corso.  (Doc. 6.)  "First Fonda Decl." refers to Declaration of Vernon Fonda.  (Doc. 12.)

interim to December 2011, the request for in-person association was denied with instructions to resubmit the request upon Bruno's release.  (*Id.*)  In January 2011, Plaintiff again submitted a request, seeking an exception to visit Bruno in prison because he "can die incarcerated" and to allow Bruno to live at home with her for medical care upon his release.  (*Id.* Ex. D.)  Again, this request was granted for correspondence only and denied as to visitation and cohabitation, and Plaintiff was instructed to resubmit the request upon Bruno's release.  (*Id.*)

In August 2011, Plaintiff requested, but was denied, permission to interact with a parolee named Douglas Montgomery, whom she described as one of her daughter's friends.  (*Id.* Ex. F.) In October 2011, Plaintiff renewed her request with respect to Montgomery upon learning that her daughter was carrying Montgomery's child.  (Schulman Aff. Ex. B, at 11.)  This request was procedurally invalidated, (First Fonda Decl. ¶ 11), and the record does not indicate whether Plaintiff ever renewed the request.

In December 2011, upon Bruno's release, Plaintiff sought permission to have an intimate relationship with Bruno, and that application was granted for "personal association," but not cohabitation.  (Second Fonda Decl. Ex. A, at 3-4.)[6]

### B. <u>Procedural Posture and the Amended Work Rule</u>

Plaintiff brought this action in 2011, seeking a declaratory judgment:  (1) that, as applied to Plaintiff, the DOCCS Work Rule is an unconstitutional infringement on Plaintiff's First Amendment freedom of intimate association; (2) striking the Work Rule as void for vagueness; and (3) striking the Work Rule as facially overbroad in violation of the First Amendment. (Complaint ("Compl."), (Doc. 1), 9-10.)  On December 14, 2011, I denied Plaintiff's application for a preliminary injunction because she failed to show irreparable harm in the absence of

---

[6] "Second Fonda Decl." refers to Second Declaration of Vernon Fonda.  (Doc. 23.)

immediate injunctive relief.  (Minute Entry dated Dec. 14, 2011.)  Defendant subsequently

moved to dismiss the Complaint, and on December 4, 2012, I dismissed Plaintiff's as-applied

and vagueness claims from the bench.  (Minute Entry dated Dec. 4, 2012.)

On February 6, 2013, as part of what he describes as an effort to merge the old DOCS

and Division of Parole employee manuals into a new DOCCS employee manual, Defendant

reworded Section 2.15 of the employee handbook.  (Martuscello Decl. ¶¶ 5-10; D's 56.1 ¶¶ 12-

14.)  The new version of the Work Rule reads as follows (deleted language in bracketed italics;

new language underlined):

> **Association with inmates, parolees or persons engaged in unlawful activities.**
> Except as otherwise authorized by [the appropriate DOCCS official], no employee shall knowingly:
>
> (a)  Associate or have any dealings with criminals or persons engaged in unlawful activities; or
>
> (b)  Engage in any conversation, communication, dealing, transaction, association, or relationship with any inmate, former inmate, parolee or former parolee, *[or any visitor, friend, or relative of same in any manner or form]* which is not necessary or proper for the discharge of the employee's duties.
>
> (c)  Engage in any communication, transaction or fraternization with any person (i.e.: visitor, friend or relative) who has an illegal or improper interest in the case of any inmate, parolee, or releasee, where such communication, transaction or fraternization may interfere with or give the appearance of interfering with the employee's duties or with the work of the Department.
>
> Any contact or attempt to contact an employee by an inmate or parolee as described above shall be reported to [the appropriate DOCCS official.]
>
> All requests for inmate association shall be addressed to the Office of the Inspector General for review.  The Inspector General will forward his or her decision to [the appropriate officials, who will then] notify the requesting employee of the final determination.

> In instances where an employee has a child in common with an inmate or parolee and the child has contact with both the employee and the inmate or parolee, the employee is not required to complete a request for inmate association form.
>
> Where an employee is uncertain about any of the above, the employee shall notify [the appropriate DOCCS official.]

("Amended Work Rule" or "Rule") (D's 56.1 ¶ 13; Martuscello Decl. Ex. A.)  Defendant asserts that the amendment "is not intended to introduce substantive changes to DOCCS policies . . . . To the contrary, the new rule is intended merely to clarify the existing rule by making explicit the longstanding practices of DOCCS and its predecessors." (Martuscello Decl. ¶ 7.)  Because it regards the changes as non-substantive, DOCCS is of the opinion that no further process – such as union approval or publication in the New York Compilation of Codes, Rules, and Regulations – is necessary, and Defendant asserts that the amended version of the rule is currently in effect. (*Id.* ¶¶ 10, 14; *see id.* Ex B (memorandum dated Mar. 1, 2013 to all DOCCS managers containing the new provision and instructing it be distributed to all employees).)  The parallel version of the Work Rule codified in State regulations remains in its original, unamended form, *see* N.Y. Comp. Codes R. & Regs. Tit. 7, § 52.18, but Defendant asserts that immediate amendment of the regulation is unnecessary.  (Martuscello Decl. ¶ 12.)  The parties now cross-move for Summary Judgment on Plaintiff's remaining facial overbreadth claim.  (Docs. 35, 40.)

## II.  DISCUSSION

### A.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant

bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if

satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every

element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex

Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the

non-movant "must do more than simply show that there is some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v.

Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

        "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other

materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the

motion, it "must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R.

Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d

Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of

fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed

for purposes of the motion" or "grant summary judgment if the motion and supporting materials

– including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ.

P. 56(e)(2), (3).

**B.  <u>Justiciability</u>**

1.  <u>Ripeness</u>

Article III, Section 2 of the U.S. Constitution restricts federal court jurisdiction to

"Cases" and "Controversies."  U.S. Const. art. III, § 2; *see Vt. Right to Life Comm., Inc. v.*

*Sorrell*, 221 F.3d 376, 381 (2d Cir. 2000).  The ripeness doctrine "is drawn both from Article III

limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation

marks omitted).  Its purpose is to "ensure that a dispute has generated injury significant enough

to satisfy the case or controversy requirement of Article III" and "prevent[] a federal court from

entangling itself in abstract disagreements over matters that are premature for review because the

injury is merely speculative and may never occur."  *Dougherty v. Town of N. Hempstead Bd. of*

*Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002).  In determining whether a claim that challenges

a law is ripe for review, the Court must consider whether the issue is fit for adjudication as well

as the hardship to the plaintiff that would result from withholding review.  *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430

U.S. 99 (1977); *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999).

An overbreadth challenge is a claim "that although a statute did not violate [the

plaintiff's] First Amendment rights, it would violate the First Amendment rights of hypothetical

third parties if applied to them.  All overbreadth challenges are facial challenges . . . . A plaintiff

claiming overbreadth need not show that the challenged regulation injured his or her First Amendment interests in any way in order to bring the overbreadth challenge." *Farrell v. Burke*, 449 F.3d 470, 498-99 (2d Cir. 2006). A party is permitted to bring an overbreadth challenge "where that party satisfies the Article III requirement of 'injury-in-fact,' and where it can be expected satisfactorily to frame the issues in the case." *Id.* at 499 (alterations and internal quotation marks omitted).

Plaintiff's claim satisfies the Article III justiciability requirements for overbreadth challenges. Plaintiff has been denied permission to associate with certain individuals under the Work Rule – namely, Bruno and Montgomery. As I noted in denying Defendant's Motion to Dismiss the overbreadth claim on ripeness grounds, the Work Rule has been enforced against Plaintiff; that it has not been enforced against Plaintiff in the precise way that renders it potentially susceptible to a facial overbreadth challenge does not mean that the overbreadth claim is unripe. (*See* Transcript of Dec. 4, 2012, (Doc. 29), 16-17.) Indeed, the entire premise of an overbreadth challenge is that the injury is to third parties, and not necessarily to the named plaintiff. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (overbreadth doctrine allows plaintiff to challenge statute not because own rights violated, but because statute's very existence may cause others not before Court to refrain from constitutionally protected conduct). Additionally, Defendant's contention that Plaintiff is only challenging the "or any visitor, friend, or relative of [an inmate, former inmate, parolee, or former parolee]" branch of the Work Rule is inaccurate. (*See* D's Mem. 16-18.)[7] Nothing in the Complaint limits Plaintiff's allegations of overbreadth in the manner asserted by Defendants, and Plaintiff's summary judgment papers

---

[7] "D's Mem." refers to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment. (Doc. 41.)

explicitly challenge the Rule in its entirety.  (*See* Compl. ¶¶ 46-49; P's Reply 17-18.)[8]  There is

no reason to believe that this plaintiff can be expected to frame the issues in this case less

satisfactorily than could any other DOCCS employee.  As such, Plaintiff's facial challenge to the

Work Rule is ripe for adjudication.

    2.  <u>Mootness</u>

    Defendant also contends that the February 2013 amendment of the Work Rule in the

DOCCS employee manual moots Plaintiff's claim.  "Mootness is a doctrinal restriction

stemming from the Article III requirement that federal courts decide only live cases or

controversies; a case is moot if the parties lack a legally cognizable interest in the outcome of the

case."  *In re Zarnel*, 619 F.3d 156, 162 (2d Cir. 2010) (internal quotation marks omitted).  A

defendant seeking to have a claim dismissed as moot bears a "heavy burden."  *Lillbask ex rel.*

*Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005).  A defendant claiming that its

voluntary cessation of the challenged conduct has mooted a lawsuit must "demonstrate that (1)

there is no reasonable expectation that the alleged violation will recur and (2) interim relief or

events have completely and irrevocably eradicated the effects of the alleged violation."

*Seidemann v. Bowen*, 499 F.3d 119, 128 (2d Cir. 2007); *see Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

    As a threshold matter, Plaintiff argues that the purported amendment to the Work Rule

has no effect because (a) the Amended Work Rule was not approved in collective bargaining

between DOCCS and its employee unions and (b) an amendment to the employee manual has no

effect until the version of the Work Rule as it exists in the New York Compilation of Codes,

Rules, and Regulations is also amended.  (*See* P's Reply 4-5.)  I decline to adopt these

---

[8] "P's Reply" refers to Reply Memorandum of Law in Further Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment.  (Doc. 38.)

arguments, however, because Plaintiff has provided neither facts nor legal authority to support

them.  Defendant asserts that the procedure used in adopting the amendment "comports with

DOCCS's longstanding practices," (D's Reply 8),[9] and I see no reason not to credit this

assertion.

The Amended Work Rule clearly serves to narrow the scope of associations prohibited by

the *text* of the Work Rule.  Defendant asserts, however, that "[t]he purpose of the amendment to

Section 2.15 is to clarify the language of the association rule, not to change its substance. . . .

[T]he amendment to Section 2.15 reflects what has been DOCCS's policy in practice all along.

DOCCS has no reason to return to the old language of Section 2.15 because it would not

represent a change in the policy in operation."  (D's Mem. 15.)  Rather than support a finding of

mootness, this assertion verifies the existence of a live controversy.  Codification of existing

policy and practices without implementing any substantive change to the policy's scope in

application may serve to moot a vagueness challenge or render the statute more susceptible to a

potential saving interpretation, but if indeed the amendment merely brought the regulation's

language into line with what had been DOCCS practice all along, the amendment changes

nothing and there remains a live controversy as to whether the policy in question prohibits a

substantial amount of constitutionally protected conduct.  Had DOCCS practice and

interpretation not been codified in an amendment to the Work Rule, I would have considered

those longstanding practices as evidence relevant to the question of overbreadth anyway.  *See*

*Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 176 (2d Cir. 2006).  In any event, Plaintiff

argues that the Work Rule as amended remains unconstitutionally overbroad, and thus a live

controversy exists.  (P's Reply 3-10, 20-21.)  Because the Amended Work Rule is currently in

---

[9] "D's Reply" refers to Defendant's Reply Memorandum of Law in Further Support of Their Cross-Motion for
Summary Judgment.  (Doc. 44.)

effect and continues to limit employees' ability to form personal associations, Plaintiff's claim is justiciable.

### C. <u>Freedom of Association</u>

The phrase "freedom of association" carries two distinct meanings in federal constitutional jurisprudence.  One meaning of the phrase refers to the "right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).  In another line of decisions, the U.S. Supreme Court has concluded that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme.  In this respect, freedom of association receives protection as a fundamental element of personal liberty."  *Id.* at 617-18.  The Constitution "afford[s] the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State."  *Id.* at 618 (collecting cases).

It "has not been authoritatively determined" whether this right to intimate association is implied in the First Amendment or exists as a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment.  *See Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999).  It is clear, however, that "the relationships that have been recognized as entitled to protection under either Amendment are 'distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.'"  *Piscottano v. Murphy*, 511 F.3d 247, 278 (2d Cir. 2007) (quoting *Roberts*, 468 U.S. at 620).  The Supreme Court has recognized that interpersonal

relationships fall along a spectrum encompassing "a broad range of human relationships that may make greater or lesser claims to constitutional protection . . . . Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Roberts*, 468 U.S. at 620.  Some relevant factors to consider include the relationship's "size, purpose, policies, selectivity, congeniality, and other characteristics."  *Id.*

"To determine whether a governmental rule unconstitutionally infringes on an associational freedom, courts balance the strength of the associational interest in resisting governmental interference with the state's justification for the interference."  *Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*, 502 F.3d 136, 143 (2d Cir. 2007).  This requires considering:

> (1) the strength of the associational interests asserted and their importance to the plaintiff; (2) the degree to which the rule interferes with those interests; (3) the public interests or policies served by the rule imposed; and (4) the tailoring of the rule to effectuate those interests or policies. The more important the associational interest asserted, and the more the challenged governmental rule burdens the associational freedom, the more persuasive must be the state's reasons for the intrusion, and the more precisely tailored the state's policy must be.

*Id.*  Thus, where a government regulation "substantially interferes with close familial relationships, the most exigent level of inquiry – strict scrutiny – is applied.  By contrast, where the associational interest claimed by the plaintiff is of less importance, and where the regulation challenged interferes only minimally with the associational freedom, the state's justification for the regulation need not be as weighty."  *Id.* at 143-44 (citations omitted); *see Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) (substantial interference with right to marry warrants strict scrutiny); *Moore v. City of E. Cleveland*, 431 U.S. 494, 500 (1977) (ordinance restricting ability of family

members to cohabit could not withstand strict scrutiny); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 685-86 (1977) (direct restrictions on distribution of contraceptives warrant strict scrutiny).  In contrast, indirect intrusions on protected relationships may be subject to reasonable regulation.  *Zablocki*, 434 U.S. at 386-87; *see Lyng v. Castillo*, 477 U.S. 635, 638-39 (1986) (upholding limited meaning of "household" for food stamp eligibility purposes because "the statutory classification [did not] directly and substantially interfere with family living arrangements") (internal quotation marks omitted).

### D.  Plaintiff's Overbreadth Challenge

Overbreadth challenges are a special form of facial challenge and an exception to the general rule against third-party standing.  *See Farrell*, 449 F.3d at 498.  As discussed above, the thrust of an overbreadth challenge is that, while the statute in question may have been validly enforced against the plaintiff, the statute is so broadly written as to sweep in constitutionally protected conduct, thereby chilling such activity by those not before the Court.  *Id.*  For a statute to be facially invalid under this doctrine, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  *Broadrick*, 413 U.S. at 615.  "Invalidation for overbreadth is strong medicine that is not to be casually employed."  *United States v. Williams*, 553 U.S. 285, 292-93 (2008) (internal quotation marks omitted).

#### 1.  Construction and Scope

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."  *Id.* at 293.  I find the language of the Amended Work Rule to be unambiguous.  Several aspects of the Rule are noteworthy in determining the scope of its coverage.

First, the Rule includes a *mens rea* requirement:  any prohibited association or interaction must be entered into by the DOCCS employee "knowingly."  The word appears at the very start of the Rule, in the phrase "no employee shall knowingly," which is followed by a colon and then the three operative subdivisions.  As I read the term in context, it applies to every element of the three provisions that follow.  *See Williams*, 553 U.S. at 294 (in criminal statute where "knowingly" preceded several subdivisions, that *mens rea* requirement applied to every element of subsequent subdivisions).  This excludes from the Rule any association in which the employee is unaware of the other party's status as an inmate, former inmate, parolee, former parolee, "person[] engaged in unlawful activities," or person "who has an illegal or improper interest in the case of any inmate, parolee or releasee."

Second, the Amended Work Rule strikes the phrase "or any visitor, friend, or relative of [an inmate, former inmate, parolee, or former parolee] in any manner or form" from subsection (b), which is the primary provision of the Rule and prohibits "any conversation, communication, dealing, transaction, association, or relationship" with listed individuals if that association "is not necessary or proper for the discharge of the employee's duties."  This stricken language is what the Complaint contends prohibited Plaintiff from associating with her own children due to their relationship, in turn, with Bruno (her ex-husband and an inmate).  To replace this stricken provision, the Amended Work Rule includes a new subsection (c), which prohibits "any communication, transaction or fraternization with any person (i.e.: visitor, friend, or relative)" if two conditions are met:  (1) that person "has an illegal or improper interest in the case of any inmate, parolee, or releasee"; and (2) "such communication, transaction or fraternization may interfere with or give the appearance of interfering with the employee's duties or with the work of the Department."  The phrase "communication, transaction or fraternization" has a broad

scope that encompasses almost any interaction between a DOCCS employee and anyone whom the employee knows to have "an illegal or improper interest" in a current or former inmate or parolee's case, if the association could affect or could be perceived to affect the work of DOCCS or the employee.[10]

Third, the Amended Work Rule includes a new paragraph that appears to directly address an issue raised by Plaintiff in this lawsuit. The paragraph provides that, "[i]n instances where an employee has a child in common with an inmate or parolee and the child has contact with both the employee and the inmate or parolee, the employee is not required to complete a request for inmate association form." As I read this very specific provision, an employee in that situation need not request an exception to associate with *either* the child in common *or* the inmate/parolee parent. This narrow carve-out does not, however, exempt any relationships between employees and their own children other than in the specific situation delineated.

Fourth, as Defendant is keen to point out, the Rule provides that exceptions to the above prohibitions may be granted by the DOCCS Inspector General ("IG"). The Rule lays out the method by which the IG is to communicate his "final determination" to the requesting employee, but it does not include any substantive provisions, guidelines, or factors governing the decision to grant or deny an exception.

---

[10] I am construing the Amended Work Rule, rather than the original version of the Rule, for the reasons discussed in connection with the mootness analysis above. The amendment to the Rule removes the most obviously unconstitutional aspect of the Rule – forbidding DOCCS employees from any form of association with someone who in turn associates innocently with an inmate. If Plaintiff were correct and the old version of the Rule were still in effect, that provision would plainly be overbroad. Indeed, assuming (as I do) the veracity of Defendant's position that the new and old versions of the Rule are identical once DOCCS enforcement practices are considered, it appears that Defendant applied the old version of the Rule more narrowly than its language would otherwise indicate. Defendant's "assurance that it [has applied the regulation] far more restrictively than its language provides is pertinent only as an implicit acknowledgement of the potential constitutional problems with a more natural reading." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

2.  Strict Scrutiny

As discussed above, the Amended Work Rule must be upheld if the State can provide a sufficiently persuasive justification for its restrictions.  The relationships with which Plaintiff alleges the Rule interferes – longtime romantic relationships producing children and parent-child and other immediate family relationships[11] – clearly exhibit the "relative smallness, . . . high degree of selectivity in the decision to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship" that bring an association under constitutional protection.  *Roberts*, 468 U.S. at 620; *see Piscottano*, 511 F.3d at 278-80.  These relationships also fall on the high end of the "spectrum" of protected relationships identified by the Supreme Court, *see Roberts*, 468 U.S. at 620, and state interference must therefore withstand a greater degree of scrutiny.  The determination of the precise level of scrutiny to be applied requires a weighing of several factors, *Chi Iota Colony*, 502 F.3d at 143, and courts have consistently held that substantial interference with "close familial relationships" warrants evaluation under the strict scrutiny standard.  *See Zablocki*, 434 U.S. at 386; *Chi Iota Colony*, 502 F.3d at 143-44; *cf. Poirier v. Mass. Dep't of Corr.*, 558 F.3d 92, 95-96 (1st Cir. 2009) (intimate association challenge to prison rule forbidding corrections officers from associating with inmates did not warrant strict scrutiny where corrections officer and former inmate failed to define relationship but apparently sought only to cohabit as unmarried adults).

Strict scrutiny is usually the "death knell" for the challenged regulation.  *Falwell v. Miller*, 203 F. Supp. 2d 624, 631 (W.D. Va. 2002); *Mood for a Day, Inc. v. Salt Lake Cnty.*, 953

---

[11] I am limiting analysis of the Amended Work Rule to its applicability to close familial relationships, which is the core of Plaintiff's claims.  (*See* Compl.)  Other, non-familial relationships such as neighborly interactions or one-time business transactions, (Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment on Her Overbreadth Claim ("P's Mem."), (Doc. 36.), 7), are arms-length associations not of the type afforded protection by the Constitution, (D's Mem. 13).  In any event, I need not reach the question of what level of scrutiny (if any) to apply to other types of relationships covered by the Rule, because its effect on close familial relationships is sufficient to support my finding that the Rule is substantially overbroad.

F. Supp. 1252, 1262 n.12 (D. Utah 1995).  Under strict scrutiny, the State must demonstrate that

the regulation in question furthers a compelling state interest that cannot be achieved through

less restrictive means – in other words, the regulation must be narrowly tailored to fit only that

compelling purpose.  *See Chi Iota Colony*, 502 F.3d at 143.  As I discussed from the bench when

ruling on Plaintiff's Motion for a Preliminary Injunction and again when ruling on Defendant's

Motion to Dismiss, effective prison administration is undoubtedly of the highest public interest.

*See generally Johnson v. California*, 543 U.S. 499, 510-15 (2005); *Turner v. Safley*, 482 U.S. 78,

89 (1987); *Seelig v. Koehler*, 76 N.Y.2d 87, 93-95 (1990).  "Acknowledging the expertise of

[prison] officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate

problems of prison management, [the Supreme] Court has afforded considerable deference to the

determinations of prison administrators who, in the interest of security, regulate the relations

between prisoners and the outside world."  *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989).

This logic is equally applicable to relationships between prisoners and corrections officers.  *See*

*Poirier*, 558 F.3d at 96 (noting, in the context of an intimate association challenge to prison rule

forbidding corrections officers from associating with inmates, that courts "afford significant

deference to prison administrators in regard to prison security measures"); *Piscottano*, 511 F.3d

at 271 (in the case of a corrections officer's First Amendment rights, "a wide degree of deference

to the employer's judgment is appropriate") (internal quotation marks omitted).

 Defendant identifies many important interests served by the Amended Work Rule.  "[A]n

employee engaged in a relationship with an inmate or parolee is more susceptible to being

enticed into bringing contraband into a prison for the inmate or on behalf of the parolee to be

given to another inmate."  (First Fonda Decl. ¶ 5.)  Similarly, it is important that the public know

that corrections employees cannot be "reached" for such purposes.  (*Id.*)  Further, if both parties

know they cannot have a relationship on the outside, it reduces the chances of a perhaps illegal

inmate-employee relationship developing while the inmate is still incarcerated.  (*Id.*)  There is

also a concern about potential instability should a corrections officer and former inmate be

allowed to associate or live together, and this instability could affect the work performance of the

officer.  (*Id.* ¶ 7.)

> The prospect of a guard-prisoner or guard-former prisoner relationship
> poses a clear and obvious threat to the maintenance of prison order and
> security.  Contemporary news stories remind us that prison rules barring
> fraternization between prison staff and prisoners are eminently reasonable.
> *See* "Prison escape foiled, DA says," *The Boston Globe,* November 26,
> 2008, at 1 ("A nurse was charged yesterday with trying to help one of the
> state's most dangerous inmates escape . . . by smuggling him saw blades
> and a handcuff key.").

*Poirier*, 558 F.3d at 96.  The State's interest in the safe and orderly administration of its prison

system is surely a compelling one.[12]

The Amended Work Rule satisfies the first prong of the strict scrutiny analysis, but it

does not survive the second.  The Rule is not narrowly tailored to further the State's compelling

interest, and it imposes unnecessary restrictions on the freedom of DOCCS employees.  DOCCS

has failed to persuade the Court that such a broad rule – which prohibits a seemingly endless

number of constitutionally protected familial relationships – is necessary for orderly prison

administration.  The Rule prohibits any form of association between DOCCS employees and

inmates, former inmates, parolees, and former parolees without regard to how remote the threat

of a conflict of interest might be.  It provides no temporal or geographical limitation with respect

to the former inmate's incarceration, nor does its prohibition account for variations in the

seriousness of that person's offense or his or her prison disciplinary history.  The association is

---

[12] Additionally, Defendant is correct that corrections officers voluntarily sacrifice certain rights in accepting that
position.  *See, e.g.*, *Seelig*, 76 N.Y.2d at 96 ("By choosing to work in the paramilitary milieu of [the corrections
field], guards voluntarily sacrifice certain cherished freedoms.").

forbidden even if the employee works in Buffalo and the family member did time in New York City; whether the family member's offense was murder or cloning a phone; whether the inmate was a model prisoner or a routine violator of prison rules; and even if the family member has had a clean record for decades.  This blanket prohibition on contact of any kind amounts to use of a blunt axe when a scalpel is called for.  The risk of the Rule chilling constitutionally protected relationships is substantial, *see, e.g.*, *Via v. Taylor*, 224 F. Supp. 2d 753, 770-71 (D. Del. 2002) (striking down similar regulation as overbroad after discussing examples of corrections officers who had ended personal relationships out of fear of enforcement), and it is not difficult to imagine any number of alternative ways that DOCCS could have drawn the Rule in an appropriately narrow fashion.  I therefore hold that so much of the Amended Work Rule as applies to constitutionally protected close familial relationships does not withstand strict scrutiny.

      3.  <u>Substantial Overbreadth</u>

In order for a statute or regulation to be unconstitutionally overbroad, it must prohibit a "substantial" amount of constitutionally protected activity.  *Williams*, 553 U.S. at 297.  In determining whether a regulation is substantially overbroad, a court may examine possible applications of the regulation in factual contexts other than those of the plaintiff in the instant case.  *See NAACP v. Button*, 371 U.S. 415, 432-33 (1963).  As earlier noted, "overbreadth challenges are based upon the hypothetical application of the statute to third parties." *Farrell*, 449 F.3d at 499.

The text of the Amended Work Rule seemingly prohibits a substantial number of close familial relationships.  For example, the Rule as written prevents a DOCCS employee from visiting or even corresponding with his or her incarcerated spouse if either (a) the couple has no

children together, or (b) their children do not maintain a relationship with the incarcerated parent (thereby taking the employee out from under the newly added exception).  The Rule also prohibits that employee from ever reestablishing contact with his or her spouse when the spouse is released and becomes a "former inmate," and the same applies to formerly incarcerated children, siblings, or parents.  A DOCCS employee would be in violation of the Rule if he had any contact with a parent who served thirty days in jail in the 1960s for dodging the Vietnam War draft.  The hypothetical scenarios are as endless as they are realistic and commonplace.  I am sure that a majority – indeed, possibly a vast majority – of the situations in which the Rule is enforced do not involve close family members.  But where a system involves 94,000 inmates and parolees and 29,000 employees, and the Rule extends to former inmates and parolees as well, the number of situations in which the Rule would prohibit constitutionally protected relationships must be substantial.  I thus find that there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court."  *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

### 4.  The Exceptions Clause

Defendant argues that Plaintiff's reading of the Amended Work Rule "depends on pretending that an important feature of it, the exception clause, does not exist."  (D's Reply 2.)  It is true that administrative interpretation and practice, including the granting of discretionary exceptions, are relevant when assessing the facial constitutionality of a state statute or regulation. When resolving facial challenges, courts look to "not only the text of the ordinance, but also any binding judicial or administrative construction of it.  And we are permitted—indeed, required— to consider the well-established practice of the authority enforcing the ordinance."  *Field Day*, 463 F.3d at 176.  To be considered, however, the state construction and interpretation of the rule

must be "authoritative[]," and the agency's regular practices must have "virtually the force of a judicial construction." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988).

In this case, "[t]he only thing standing between" DOCCS employees and disciplinary action for maintaining a constitutionally protected relationship "is the statute's exceptions clause." *Stevens*, 559 U.S. at 477.  The only regular practice that DOCCS has offered as an appropriate limiting construction is the "long-standing policy that employees are not required to seek approval to associate with their children or other close relatives merely because those children or other close relatives have associations with inmates or parolees." (Second Fonda Decl. ¶ 5; *see id.* Ex. A, at 4.)  Contrary to Defendant's suggestion, this policy does not establish the Amended Work Rule's constitutionality.  As discussed above, the Rule still prohibits employees from associating with their spouses, children, or other close relatives if those persons are *themselves* inmates or former inmates.[13]  Further, while Defendant repeatedly invokes the exceptions clause as an avenue to save the Rule, exceptions are granted in the unbounded discretion of the DOCCS IG.  Neither the Rule nor any implementing regulations set forth any factors he or she must consider or otherwise guide the exercise of that discretion.  The Constitution "protects against the Government; it does not leave us at the mercy of *noblesse oblige*.  We would not uphold an unconstitutional statute merely because the Government

---

[13] Vernon Fonda, the DOCCS IG, also states that "DOCCS employees will have family members who encounter the criminal justice system and who do, in fact, end up at DOCCS.  It is for just this reason that an exception to section 2.15 exists, to allow for employees to make an application for an exception to the rule for family members. . . . I am personally aware of cases in which an employee has submitted a request upon an inmates [sic] release from prison for association at family functions and it was in fact granted."  (First Fonda Decl. ¶¶ 5, 14.)  Fonda nowhere suggests, however, that there is a "binding judicial or administrative construction" requiring such exceptions to be granted.  *Field Day*, 463 F.3d at 176.  Fonda similarly provides no evidence that the practice of granting exceptions for family members is "well-established," *id.*, or that such practice has "virtually the force of a judicial construction," *City of Lakewood*, 486 U.S. at 770 n.11.  To the contrary, Fonda's language implies that there are such cases in which an exception is *not* granted for family gatherings.  And Fonda does not address – let alone suggest that exceptions are routinely granted for – associations beyond occasional family gatherings, such as cohabitation.

promised to use it responsibly." *Stevens*, 559 U.S. at 480.  Defendant's contention regarding the exceptions clause amounts to asking this Court to trust him to enforce the overbroad statute appropriately, but a regulation is overbroad where protected conduct "require[s] official approval under laws that delegate[] standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights." *Broadrick*, 413 U.S. at 613. The Amended Work Rule is unconstitutionally overbroad and is not saved by the existence of Defendant's unbounded discretion to grant exceptions.

*     *     *

If indeed DOCCS does not apply the regulation at issue in situations where the inmate, former inmate, parolee, or former parolee is a close family member of the employee, enjoining it from doing so will have little practical effect on its operations.  But, as discussed above, the record does not show any authoritative policy of either non-enforcement or the granting of exceptions where close family members are involved (except as to children in common with a former inmate), and there are no articulated standards for exceptions.  Given the importance of the relationships at issue, an injunction is necessary to the extent the regulation is overbroad.

The compelling state interests animating the regulation, however, do justify a requirement that employees inform DOCCS of associations with current or former inmates or parolees, so that DOCCS can take administrative steps – such as a change in duties or facility assignment – to minimize the risk of interference with orderly prison administration.  Thus, while an employee need not seek permission to associate with a close family member, he or she must still advise DOCCS of such associations as currently required under the Amended Work Rule.

Further, it is quite possible that a rule very much like the Amended Work Rule could be constitutional if it provided standards for exceptions that took the appropriate factors into account, such that close family relationships were restricted only where institutional concerns truly so required.

## III.  <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is hereby GRANTED and Defendant's Cross-Motion for Summary Judgment is hereby DENIED.  The Clerk of Court is directed to terminate the pending Motions, (Docs. 35, 40).

Defendant Brian Fischer, in his official capacity as Commissioner of the New York State Department of Corrections and Community Supervision, and all others acting under his direction or control, are hereby **ENJOINED** from investigating, enforcing, or reviewing any matter premised upon Section 52.18 of Title 7 of the New York Compilation of Codes, Rules, and Regulations or Section 2.15 of the DOCCS Employee Manual, to the extent that:

    **(1)** such investigation, enforcement, or review involves a perceived violation of subsection (b) of Section 2.15 by a DOCCS employee; and

    **(2)** the individual with whom such employee has allegedly engaged in a conversation, communication, dealing, transaction, association, or relationship is the employee's spouse, parent, sibling, child, person with whom the employee has a child in common, or other close family member.

Nothing in this Order shall prohibit the investigation, enforcement, or review of any matter arising under any other subsection of Section 52.18 or Section 2.15.  Additionally, the requirement that DOCCS employees report to the appropriate DOCCS official any contact with an inmate, former inmate, parolee, or former parolee as described in Section 52.18 and Section

2.15, even as to contact described in subsection (b) of Section 2.15, is unaffected by this Order.

The parties are directed to submit a proposed Judgment within fourteen days of the date of this

Opinion and Order.

**SO ORDERED.**

Dated: October 22, 2013
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.